[Cite as *In re Petition for Adoption of A.V.*, 2022-Ohio-2969.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
SANDUSKY COUNTY


In re Petition for Adoption of A.V.   Court of Appeals No.  S-21-019

              Trial Court No.  20214002


             **DECISION AND JUDGMENT**

             Decided:  August 24, 2022

* * * * *

Autumn D. Adams, for appellant.

* * * * *

**OSOWIK, J.**

{¶ 1} Appellant, J.V., appeals the October 12, 2021 judgment of the Sandusky Court of Common Pleas, Probate Division, denying her petition to adopt her stepdaughter, A.V., without the consent of A.V.'s father, S.S.  S.S. has not filed a brief on appeal.  For the following reasons, we affirm the trial court judgment.

# I.    Background

{¶ 2} A.H. ("mother") is the mother of A.V. ("daughter") (born in 2016) and N.S ("son") (born in 2011).  S.S. ("father") is the children's father.  Mother and father have never lived together or been married to one another, and they are no longer in a relationship.  Mother is now married to J.V. ("stepmother"), with whom she has lived since June of 2019.

{¶ 3} On February 2, 2021, stepmother filed a petition to adopt daughter.  She alleged that father's consent to the adoption was not required because he had failed without justifiable cause to provide more than de minimis contact with daughter for a period of one year immediately preceding the filing of the adoption petition.

{¶ 4} Father challenged stepmother's claim that his consent was not required and contested the adoption.  The probate court conducted a hearing on May 7, 2021, to determine whether father's consent to the adoption was necessary.

## A. The Consent Hearing

{¶ 5} Three witnesses testified at the May 7, 2021 hearing:  (1) mother; (2) stepmother; and (3) father.

## 1. Mother

{¶ 6} Mother testified that she and father have two children together:  nine-year-old son and two-and-a-half-year-old daughter.  She and father have not "officially" been "together" since daughter was born.  Mother has lived in the same place for 12 years and

2.

father knows where she lives. She and stepmother have lived together since June of 2019.

{¶ 7} Father exercises regular parenting time with son by agreement of the parties—not through the court. He keeps son every other weekend and during the week when he has free time or requests to visit with son. Father calls son regularly. Mother prefers that father not come to her home to visit son. She acknowledged that she prevented father from visiting with son for three months while CPS investigated claims brought to its attention by a therapist. She maintained that once that investigation was over, regular visits resumed.

{¶ 8} Despite exercising visitation with son, father has not attempted or asked to see daughter, has never asked to speak with her on the phone, has not sent her letters, birthday cards, or gifts, and has not petitioned the juvenile court for parenting time. When father visits with son, they meet at a public place, usually at a church. Mother has never brought daughter to these transfers because of her age, because father has not had any type of relationship with her, and because father has never requested that she bring her.

{¶ 9} Mother admitted that she does not want father to have a relationship with daughter. She has never suggested that father talk to daughter when he calls to speak with son. Father does not call mother on the phone—they communicate via text message. Father calls only to speak with son.

3.

## 2. Stepmother

{¶ 10} Stepmother testified that she met daughter in October of 2018. She is involved in daughter's life. Stepmother and father have never had any contact with one another. She has no knowledge of father attempting to contact daughter.

## 3. Father

{¶ 11} Father testified that the last time he saw daughter was her birthday in 2019. He knows where mother lives, however, he has been told that he is not welcome at her home. Father conceded that he has not asked mother to see daughter, but he insisted that in late 2018 or early 2019, mother told him that he cannot see daughter. Mother told him that he is not a father, he is not part of daughter's life, he will not be part of daughter's life, and to leave her alone.

{¶ 12} Father has not sent daughter birthday cards or gifts in the last year because he is afraid of the "repercussions." He has an Easter basket for daughter that his parents got for her at church. He also has a tiara and other small things for her at his house, and his sister has bought clothes for daughter that he has never given her. He does not believe mother would give these things to daughter. Because he is "not allowed to see her," father does not know basic things about daughter, such as who her doctor is or what her favorite color is. Any information he has about daughter comes from son. He talks to son about daughter. He asks how she's doing, how she's growing, how the family dynamics are, and if everyone is happy and healthy.

4.

**{¶ 13}** Father asked daughter's maternal grandmother to help him see his kids. Mother instructed him not to contact her family anymore and then, more recently, not to call *her* anymore—to only communicate via text. Mother told him a year ago "you're not [daughter's] father, "you're not in her life," "you're not going to be in her life," "she doesn't belong with you," "don't be * * * calling us." "If you want to see [son], you can see [son], it's limited to that." This was "absolutely" mother's decision and not something to which he agreed. Father is concerned that if he does not comply with mother's demands, she will interfere with his relationship with son.

**{¶ 14}** Father has not filed anything with the juvenile court requesting parenting time with daughter. He has considered filing for visitation in juvenile court, but he did not have the money to do so. Additionally, he is afraid of angering or upsetting mother, "upsetting the balance," or "ruffling [mother's] feathers." He fears that his parenting time with son will be taken away. He filed for visitation with his older son, and it was not beneficial for him, his son, or his son's mother. He did not believe it would be beneficial for him, son, daughter, and mother either.

**{¶ 15}** Father tries to spend as much time as possible with son. He does not have a visitation agreement; mother wanted him to sign one, but he did not. Father talks to son on the phone about once every two weeks. He has considered getting him a cellphone so he can call him daily, but he is too young.

5.

{¶ 16} Despite mother's claim that she has denied him visitation with son only during the CPS investigation (which he denied even knowing was pending), father said that there have been other times that mother has restricted his visitation with son. The last weekend son was supposed to come to father's house, mother told father that son did not want to come. She did the same thing a few weekends before that. Father believes mother is obligated to tell son that he has to spend time with him.

{¶ 17} Occasionally, father will go six weeks without seeing son. It is devastating to him when mother tells him that son is not going with him, but he does not know how to push back against her without his time with son getting further restricted. He testified that often on Sundays when it is time for son to go home, son says he is not ready to go back to mother's, but father feels that he does not have the option of just keeping son with him when he says he does not want to go home.

{¶ 18} Father has never had contact with stepmother. He saw her once in mother's car. He asks son how mother and stepmother are doing, but does not have contact with the family. Mother rarely answers the phone if father calls her, or she will answer and immediately pass the phone to son. Mother never sends father pictures of either of the children. Within the past year, he sent pictures of himself with daughter to mother. She told him not to do that anymore because stepmother does not like it and it is inappropriate.

{¶ 19} Father loves daughter. He wants son and daughter to be close, and he wants to be part of that. He wants to communicate with daughter freely and be a bigger part of his children's lives. He would like to have son and daughter together at his home.

**B. The Trial Court Judgment**

{¶ 20} In a judgment journalized on October 12, 2021, the trial court made the following findings:

- It has been several years since father has physically seen daughter;

- Father knows where mother and stepmother live;

- Father regularly sees son;

- The relationship between mother and father is acrimonious;

- Mother did not offer father time with daughter and did not bring daughter with her when transporting son to visitation with father;

- Mother did not promote or encourage phone conversations between father and daughter when father would call to speak with son;

- Mother did not include, involve, or inform father of routine matters involving daughter;

- Father was passive, did not seek court orders for visitation, and did not make specific attempts to seek out time with daughter—he simply empowered mother to make those decisions;

7.

- Mother and stepmother did not want father to have a relationship with daughter;

- Mother and father communicate poorly and by text messages only;

- Father was afraid of pushing for time with daughter for fear of "messing with the balance" regarding his time with son;

- Mother blocked father from seeing son for a three-month period of time;

- Father believed mother was interfering with his ability to see daughter, but it was unclear what efforts he made;

- Mother and stepmother were in a position of authority and control and did not make it comfortable for father to establish relationship or contact with daughter; and

- Although under no legal obligation to do so, mother and stepmother make it uncomfortable for father to establish a relationship or contact with daughter, they appeared to take steps to intentionally make it more difficult and uncomfortable for father, while making their position clear to father.

{¶ 21} The court found by clear and convincing evidence that father "willfully failed" to have contact with daughter for the year preceding the petition for adoption. But it also found that there was justifiable cause for his failure to have contact with the child.

Accordingly, it concluded that father's consent to the adoption was required, and because he was withholding consent, stepmother's petition for adoption must be denied.

{¶ 22} Stepmother appealed. She assigns the following error for our review:

> The Trial Court's finding Father's absolute lack of contact with A.V. was justifiable because he felt "uncomfortable" based upon his assumptions of how Mother would treat him was against the manifest weight of the evidence.

## II.    Legal Standard

{¶ 23} Ordinarily, a minor child's natural parents must consent in writing before the child may be adopted. *In re Adoption of C.N.A.,* 2018-Ohio-897, 108 N.E.3d 553, ¶ 7 (3d Dist.). However, under R.C. 3107.07(A), consent to adoption is not required of a parent of a child "when it is alleged in the adoption petition and the court, after proper service of notice and hearing, finds by clear and convincing evidence that the parent has failed without justifiable cause to provide more than de minimis contact with the minor * * * for a period of at least one year immediately preceding * * * the filing of the adoption petition * * *." Courts strictly construe R.C. 3107.07(A) in favor of the non-consenting parent. *In re Adoption of B.I.,* 157 Ohio St.3d 29, 2019-Ohio-2450, 131 N.E.3d 28, ¶ 12, citing *In re Adoption of Sunderhaus*, 63 Ohio St.3d 127, 132, 585 N.E.2d 418 (1992).

{¶ 24} Because cases under R.C. 3107.07(A) involve the termination of fundamental parental rights, "the party petitioning for adoption has the burden of proving,

9.

by clear and convincing evidence, that the parent failed to [provide more than de minimis contact] with the child during the requisite one-year period and that there was no justifiable cause for the failure of [contact]."[1]  *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985).  In other words, "the petitioner must prove by clear and convincing evidence that the parent's consent is not required."  *In re Adoption of T.U.,* 2020-Ohio-841, 152 N.E.3d 943, ¶ 15 (6th Dist.).

**{¶ 25}** "To meet this burden, the petitioner must present competent and credible evidence sufficient for the court to form a firm conviction or belief that the parent unjustifiably failed to * * * contact the child."  *Id.*  Once the petitioner makes this showing, "the burden shifts to the parent to show a 'facially justifiable' cause for the failure."  *Id.*  "Regardless, the burden of proof remains with the petitioner, who must establish the lack of justifiable cause by clear and convincing evidence."  *Id.*

**{¶ 26}** The probate court engages in a two-step process to determine whether a parent's consent is not required based on his failure to have more than de minimis contact with the child.  *Id.* at ¶ 17.  "First, the court determines whether the parent failed to have more than de minimis contact with the child in the year preceding the filing of the adoption petition."  *Id.*  Second, it determines whether there was "justifiable cause" for the parent's lack of contact.  *Id.*

---

[1] The version of the statute applicable when *Holcomb* was decided referred to "communication" instead of "contact."

10.

{¶ 27} We review the probate court's factual determination of whether the parent had more than de minimis contact with the child for an abuse of discretion. *Id.* at ¶ 18. An abuse of discretion connotes that the trial court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 28} We review the probate court's justifiable-cause determination under a manifest-weight-of-the-evidence standard. *In re Adoption of T.U.* at ¶ 19. In doing so, we must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the decision must be reversed. *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). But while we review the evidence and consider the witnesses' credibility, we must be mindful that the trial court, as the trier of fact, is in the best position to weigh evidence and evaluate testimony. *In re Adoption of T.U.* at ¶ 19, citing *In re P.W.*, 6th Dist. Lucas No. L-12-1060, 2012-Ohio-3556, ¶ 20. "The determination of the probate court should not be overturned unless it is unsupported by clear and convincing evidence." *Holcomb* at 368.

### III.    Analysis

{¶ 29} The probate court found—and it is undisputed—that father had no contact with daughter in the year preceding stepmother's petition to adopt daughter. The sole

11.

issue on appeal is whether the trial court erred in finding that father's lack of contact with daughter was justifiable.

{¶ 30} Stepmother argues that father being "uncomfortable" with asserting his parental rights based on how he believed mother would react is not justifiable cause for his lack of contact with daughter. She claims that father failed to prove that mother significantly interfered with or significantly discouraged contact between father and daughter. She emphasizes that mother was under no obligation to make it "comfortable" for father to have a relationship or contact with daughter, and none of father's fears were based on mother's actual conduct. Stepmother maintains that mother did not have a pattern of cutting off father's contact with son as retaliation for not getting her way. She insists that if father wanted to have contact with daughter, it was incumbent on him to initiate such contact. And she criticizes father's failure to seek court intervention to enforce his parental rights.

{¶ 31} As an initial matter, a non-consenting natural parent is not required to prove that his failure to contact his child was justifiable. In *Holcomb*, the Ohio Supreme Court made clear that "[n]o burden is to be placed upon the non-consenting parent to prove that his failure to communicate was justifiable." *Id.* at 368. Rather, the statute is drafted "to require petitioner to establish each of his allegations," including lack of justifiable cause. *Id.* While the non-consenting parent must come forward with evidence to show some facially justifiable cause for failing to have contact with the child, the

12.

burden is ultimately on the petitioner to prove that no justifiable cause exists. *In re Adoption of M.T.R.,* 5th Dist. Licking No. 2022 CA 00010, 2022-Ohio-2473, ¶ 41.

{¶ 32} "'[J]ustifiable cause' is not defined in R.C. 3107.07." *In the Matter of Adoption of R.A.H.*, 2021-Ohio-1667, 172 N.E.3d 1140, ¶ 14 (2d Dist.). Some courts have looked to the definition of "justifiable" supplied by Black's Law Dictionary: "Legally or morally acceptable for one or more good reasons; excusable; defensible." Black's Law Dictionary (11th ed. 2019). *See, e.g., In re Adoption of B.I.,* 2017-Ohio-9116, 101 N.E.3d 1171, ¶ 10 (1st Dist.), *aff'd* 157 Ohio St.3d 29, 2019-Ohio-2450, 131 N.E.3d 28; *In re E.W.H.,* 4th Dist. Meigs No. 16CA8, 2016-Ohio-7849, ¶ 33; *R.A.H.* at ¶ 14. "The question of whether justifiable cause exists in a particular case is a factual determination for the probate court and will not be disturbed upon appeal unless such determination is unsupported by clear and convincing evidence." *Holcomb* at paragraph three of the syllabus.

{¶ 33} A custodial parent's significant interference or significant discouragement of contact between the child and the non-custodial parent may constitute justifiable cause for the non-custodial parent's failure to have contact with the child. *Id.* Once the non-custodial parent presents evidence of significant interference or discouragement of contact, it becomes necessary for petitioner to demonstrate that the lack of contact was not justifiable. *In re Adoption of Riegle*, 3d Dist. No. 5-01-37, 2002-Ohio-694. In determining whether the failure to provide contact is justifiable, the issue is not whether it

13.

was possible for the natural parent to have done more to overcome the interference. *In re Adoption of C.N.A.,* 2018-Ohio-897, 108 N.E.3d 553, at ¶ 17.

{¶ 34} Here, the court found that stepmother did not make the required proof necessary to show that father lacked justifiable cause for his lack of contact with daughter. It found that the parties' relationship "is clearly acrimonious with the tension among all 3 parties noticeable during court interactions." And it observed that mother and stepmother "were clearly in the position of authority and control." It concluded that mother's "significant discouragement" of contact between father and daughter "rises to the level of justifiable cause."

{¶ 35} We have reviewed the record, including the transcript of the May 21, 2021 hearing. At that hearing, father testified that mother told him that he could not see daughter. In fact, mother was candid in conceding that she did not want father to have a relationship with daughter. When father sought intercession from mother's family, she told him in no uncertain terms not to contact her or anyone in her family. Father testified that he was afraid to demand to see daughter because mother can—and has—made unilateral decisions that have prevented him from seeing his son. According to father, and contrary to stepmother's characterizations, father's fear was not based merely on his perception of what mother *might* do if he "push[ed] back against her"—it was based on what he had come to believe was an "absolutely purposeful" pattern of mother decreasing his visitation time with his son.

14.

{¶ 36} "[I]ssues regarding failure of [contact] and lack of justifiable cause are questions of fact for the probate court." *Holcomb* at 368. The probate court, as the finder of fact, "is in the best position to observe the demeanor of the parties, to assess their credibility, and to determine the accuracy of their testimony." *Id.* at 367-68. The probate court found father's testimony credible and concluded that he had justifiable cause for failing to provide more than de minimis contact with daughter. Its determination "is not unsupported by clear and convincing evidence" and is not against the manifest weight of the evidence. *See In re Matter of Adoption of Hupp,* 9 Ohio App.3d 128, 132, 458 N.E.2d 878 (8th Dist.1982) (finding that father's failure to communicate with child was not "without justifiable cause" where mother acknowledged that she declined to permit visitation, threatened to seek increase in child support if he insisted on seeing children, and told the father she did not want him to see children, and mother and father's relationship deteriorated after she met and married stepfather-petitioner).

{¶ 37} We find stepmother's assignment of error not well-taken.

## IV.    Conclusion

{¶ 38} The probate court's finding that father had justifiable cause for failing to provide contact with daughter was not against the manifest weight of the evidence. We find stepmother's assignment of error not well-taken and affirm the October 12, 2021

15.

judgment of the Sandusky Court of Common Pleas, Probate Division.  J.V. is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Mark L. Pietrykowski, J.      _____
                JUDGE

Thomas J. Osowik, J.

            _____
Gene A. Zmuda, J.         JUDGE
CONCUR.

            _____
                JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.